Earl, J.
This case has been argued and reargued by very able counsel. We have given it the thorough examination which its importance demands, and we have reached the conclusion that the learned trial judge erred in refusing to submit the questions of fact to the jury.
It appears that for some years prior to December, 1888, the defendant Mackay was quite largely interested in telegraph property, and in or about the year 1884 the plaintiff, in a conversation with him, offered to purchase for him certain other telegraph properties for the purpose of improving and benefiting that which he, Mackay, already owned, the purchases to be made with money furnished by Mackay. Thereafter Mackay advanced for^the purchase of such properties from time to time, during several years *817 after 1884, in all upwards of $1,000,000. There was no agreement in writing between Stokes and Mackay explaining their relations, and in December, 1888, Mackay did not even have vouchers to show how much money he had advanced to Stokes, and ■down to that time he had had no account from Stokes of the manner in which he had disbursed the money with which he had been intrusted by Mackay. Stokes had taken and he held in his own name most of the property thus purchased, although it is quite clear from the evidence that all of them were to have been turned over to Mr. Platt, Mackay’s agent in the city of Hew York. The evidence tends quite strongly to show that Mackay was to have the title to all the properties purchased with his money, but it is a disputed question of fact whether he was to have them as absolute owner or simply as collateral security for the moneys advanced. According to the claim of Stokes, as put forward in his evidence, the only interest he was to have was one-half of the profits of all the properties acquired by and through him after Mackay had been fully reimbursed for all his advances.
Prior to July 28, Í885, Mackay had loaned to 0. H. Read & Co., a firm to which Stokes belonged, and who were the proprietors of the Hoffman House in the city of Hew York, from time to time, in all the sum of $370,352.50, for which on that day he took their note payable on demand. The interest on that note was adjusted in the fall of 1888, and upon a settlement between Stokes and Mackay, the payment of the whole interest to January 1, 1889, was indorsed upon the note, the principal of the note remaining unpaid. In December, 1888, Mackay, through his-agents, from time to time, requested Stokes to turn over to his agent, Mr. Platt, the telegraph properties held by him, and Stokes complied with those requests only to a limited extent. Mackay at that time was in California, where he resided. Prior to about the 24th day of December, 1888, there had never been any negotiation on the part of Mackay for the purchase of the telegraph properties from Stokes. His uniform claim and demand had been that he was entitled to have them turned over to his agent. Shortly prior to the 24th of December, Stokes declined to turn over any more of the telegraph properties unless some agreement was made with him, showing his interest in them, and the share of profits in them to which he was entitled. Finally, on the 24th day of December, he caused an agreement to be drawn up by Col. Ingersoll, his attorney, as follows :
“This agreement made this day of ,1888, between Edward S. Stokes, of the City and State of Hew York, party of the first part, and John W. Mackay, of San Francisco, California, and Hector de Castro, of the City and State of Hew York, parties of the second part, witnesseth :
.“ That whereas, the party of the first part, is the owner of certain bonds and stock of the telegraph company known as The Hnited Lines Telegraph Company, and also of The Michigan Postal Telegraph Company, and certain stock in The Chicago *818 Board of Trade Telegraph Company, and The Pacific Telegraph Company, and The Pacific Mutual Telegraph Company, also of stock in The Lehigh Yalley Telegraph Company, and also the owner of certain contracts made between himself and E. L. Martin for the purchase of additional stock in The Pacific and The Pacific Mutual Telegraph Companies, which contracts and the liability under them, the parties of the second part hereby agree to assume; and
“ Whereas, the party of the first part has unsettled accounts with the parties of the second part for large sums of money borrowed at various times ; and
“ Whereas, the parties of the second part wish to buy, and the party of the first part wishes to sell the said telegraph property and the said securities, including all equities in contracts, as well as all judgments and liens of every kind and description appertaining thereto, and to settle and adjust the indebtedness referred to; and
“ Whereas, the parties of the second part are willing to assume the prosecution and defense of any suits now pending in relation to said property, and to prosecute and defend the same, paying the costs thereof; and
“ Whereas, the party of the first part has agreed that in the prosecution and defense of such suits he will furnish any and all testimony that he may have, and will at all times furnish the facts in relation thereto ; and
“ Whereas, the party of the first part is indebted for legal services performed in and about said business, and has signed certain bonds and certain contracts to idemnify others, the parties of the second part hereby agree to pay and discharge said indebtedness, as well as to keep the party of the first part harmless by reason of the signing of said bonds and contracts; and
“ Whereas, it is the intention of both parties that the said party of the first part shall be relieved from all the indebtedness and responsibility referred to in this agreement, from and after the date hereof, and that the parties of the second part shall be relieved from all responsibility of every kind and nature by reason of any transaction or transactions before this date.
“ Now, therefore, it is agreed, by and between the parties, as follows:
“ First. The party of the first part shall furnish all testimony,, and shall make, execute and deliver all papers that may be necessary in the prosecution or defense of any suits not pending, or that may hereafter be brought, without charge.
“ Second. The said party of the first part hereby agrees to turn over to the parties of the second all the bonds and stock to which he may be entitled, of The United Lines Telegraph Company, and that he will assign all judgments that he may' own, or in which he may be interested, that have been recovered against The United Lines Telegraph Company, or the Bankers and Merchants’ Telegraph Company, or that in any event may 'be a lien upon the property of the United Lines Telegraph Company, and that the same shall be assigned and delivered in due *819 form free of all charge and expense to the parties of the second part.
“ Third. It is further agreed that the said party of the first part will so assign all of the property before mentioned, and, all of his rights, interests and equities therein, for and in consideration of the cancellation of the indebtedness referred to, and upon the payment of the sum of $100,000, upon the delivery of the bonds and securities referred to in the annexed schedules.
“ It is agreed on the part of the parties of the second part, that the receipt of the said property and interests herein referred to, shall be in full satisfaction of all claims and demands, of whatever kind and nature, against the said Stokes, and also against the firm of C. H. Read & Company, and that the said parties of the second part will save and keep harmless the said parties from any further costs or liability growing out of the transactions connected with the said telegraph business.
“ There is attached hereto a schedule marked [1] A,’ the same being a list of all the properties; also a schedule marked ‘ B,’ the same being a list of suits now pending; also a schedule marked ‘ C,’ the same being a list of the judgments.
“In witness whereof, we have hereunto set our hands and seal, this day of
, 188 .”
On the 24th day of December Stokes had and presented that agreement at a meeting between himself, De Castro, Ingersoll and Platt. De Castro had been in the employ of Mackay, and had been the intermediary between Stokes and Mackay in the negotiations in reference to the telegraph properties, it having been deemed desirable by both of them that Mackay should not be known in Stokes’ transactions in reference to the properties. It was because De Castro had acted as such intermediary that Stokes required that his name should be signed to the contract as one of the parties of the second part. Mackay knew nothing whatever about the terms of the proposed agreement, and nothing contained in the agreement had ever been brought to his attention. The debt which he held against the firm of C. H. Read & Co. had no connection with, or relation to, the telegraph business or the telegraph properties. ¡Neither of the persons who were present at the time this agreement was signed by Stokes and De Castro had any agency whatever in reference thereto for Mackay. There is no evidence whatever that anybody was authorized to enter into such agreement for Mackay, or to negotiate for the purchase of the telegraph properties for him, or that Mackay ever contemplated their purchase. But the evidence tends to show that he always understood and claimed that the properties belonged to him. On the 24th day of December the arrangement was made between Stokes, De Castro and Ingersoll that Stokes should deliver certain telegraph bonds into the hands of Ingersoll, to be held by him as custodian until the agreement was approved or signed by Mackay, when they were to be turned over to Platt as Mackay’s agent; but that if Mackay did not approve of or sign *820 the contract then it was to be null and void, and the bonds were •to be returned to Stokes. At that time Ingersoll gave his receipt for $935,000, par value of the telegraph bonds. This proposed contract was executed in duplicate by Stokes and De Castro. Stokes kept one copy, and it was understood and arranged between Ingersoll and Stokes that the other copy should be sent by Ingersoll to Mackay in California, for his signature. At that interview between De Castro, Ingersoll and Stokes two telegrams were prepared which were to be sent to Mackay, and on that day one was sent by Mr. Platt as follows:
“ I did not succeed in meeting Stokes until late to-day, when made demand for IT. L. T. Co. Eds. Ingersoll was present, and said that, owing to legal complications, he thinks it would be better not to deliver IT. L. T. Co. Eds. to me for the present, and Ingersoll requests me to telegraph you that Stokes has deposited with him to-day 900,000, 30,000, 5.000 1st Mtge. IT. L. T. Co. Eds. 1,000,000, 600,000 stock will be assigned, and all judgments turned over on your order as soon as agreement forwarded to-day is signed by you. He said this course had to be pursued to avoid trouble in the courts, and he says this gives you entire control of the property.
“E. 0. Platt.”
And another one by De Castro as follows:
“ E. S. Stokes turned over to Col. E. G. Ingersoll nine hundred and thirty-five thousand of bonds and other securities. He signed ■also an agreement which is forwarded to you and which leaves him out. Col. E. G. Ingersoll will turn over to E. C. Platt these securities for custody; this is the only way it could be done, and I hope it will be satisfactory. E. S. Stokes swears that he told you about having to use some of the bonds to raise money which he needed absolutely to avoid bankruptcy. Please accept my best wishes for happy Xmas.
“H. De Castro.”
To these telegrams Mackay replied to De Castro as follows:
“ All right and satisfactory. I want you to tell to Ingersoll to do nothing in this case except what he knows to be correct and legal, as I do not want trouble for what has been done in the past, or in the future.”
And then to Platt as follows:
“ Telegram received. All right. You take whatever securities Ingersoll gives you, as Ingersoll understands this matter fully. I do not wish him to do anything but what is legal.”
On the 26th day of December, Ingersoll wrote the following , letter to Mackay, inclosing the contract:
“New York, Dec. 26, 1888.
“John W. Mackay, Esq.:
“ My Dear Friend—1 regret that there was any feeling on your part about the United States securities. I wanted to carry out your views, so did, Mr. Stokes, but it was impossible to do so. *821 These bonds have been issued for about three years, and Mr. Stokes has sworn again and again that they belonged to him, and I understood and understand the fact so to be. Suits had been commenced to enjoin Mr. Stokes from selling or disposing of these bonds, and these suits were defeated by the fact that he had not disposed of them and did not intend to. This applied to 300 of them. If they had been turned over or sold, the suits would have gone against us.
“ Under these circumstances the bonds could not be turned over in the way suggested by you. They could be sold, and this ■action would be consistent with all the testimony given by Mr. Stokes.
“ Nine hundred and thirty-five of the bonds have been delivered to me and one million six hundred thousand stock.
“ Orders will be given me on Farmers’ Loan and Trust Company for all stock held by that Co. In other words, all the securities will be handed to me.
“ It seems to me, taking into consideration the complications of the matters between you and Mr. Stokes and the condition of the business, that everything should be settled. There is some danger that it may be claimed that you were a partner and are so still in all this business, including the hotel, and consequently I thought it advisable to include everything, and I think this will meet your approval. ■
“You know that some bonds were used as collateral. Thirty-five thousand dollars was borrowed at the Western National. I gave the note and Mr. Stokes indorsed and deposited the collateral.' At that time the money had to be raised or the effect would have been disastrous. If Stokes had then failed the property would have been attached from every side & the arrangement with the Western Union would have failed. I thought then, and still think, that it was the thing to do. I believe that you have been informed as to the rest.
“ The consideration mentioned will clear everything, take all the bonds up and put the entire property into your hands.
“ In foreclosing the deed of trust I think that De Castro had better take charge of that.
“ I suppose that De Castro has written you on this whole business. I inclose the contract. If it meets your approval please sign & return and I will send you duplicate.
“I am going to Washington to-night to arrange with the Atty. Gen. and the counsel of Western Union & Union Pacific to argue the application for injunction to prevent Union Pacific from carrying out the recent act of Congress in regard to taking messages for all telegraph companies.
“Yours truly,
“B. G. Ing-eksoll.”
This letter was written and mailed the latter part of the day it is dated, and the telegrams to De Castro and Platt had. been previously received on the morning of that day, and their contents were known to Ingersoll, Stokes, De Castro and Platt, who *822 were engaged in these transactions. Notwithstanding the receipt of these telegrams, it is worthy of notice that Ingersoll in his letter stated: “I inclose the contract. If it meets your approval please sign and return and I will send you duplicate,” from which it is quite apparent that Ingersoll, who had been made the custodian of the securities to be turned over, did not understand, at the time he wrote that letter, that Mackay, by his telegrams, had approved the contract. Mackay received the letter inclosing the contract on or about January 3, 1889, and immediately wrote Col. Ingersoll as follows:
“ San Francisco, Jany. 3, 1889.
“ Col. R G-. Ingersoll :
“ My Dear Col.—Your letter and Article of Agreement dated the 26th received.
“ On looking over the agreement I see no necessity for signing it. Some portions of it are wrong. [1] You say it releases C. H. Bead & Co. from all claims.’ The claim I hold against C. H. Bead & Co. has nothing whatever to do with the Telegraph business. There is no necessity to make any change at present except to place the securities with Mr. Platt for safe keeping, etc. You know exactly what is to be done and I want nothing done except through your instructions.
“Very sincerely,
“ John W. Mackay.”
And on the next day he telegraphed De Castro as follows : “ I have received your letter. That agreement will not suit me. I will sign a proper one when I come east and the thing is cleaned up.”
The facts so far stated are not much in dispute, and if there were nothing else in the record the case would have to turn upon this evidence and the inferences to be drawn therefrom.
It is claimed on the part of the plaintiff that Mackay became bound by the telegrams which he sent to Platt and De Castro, and that as matter of law he must be held to have adopted the contract by those telegrams. It is quite true that without knowing anything that was done by Ingersoll and De Castro in the city of New York he could have used language strong enough in those telegrams to have made himself a party to the contract just as it was written. Fitzmaurice v. Bagley, 6 Ell. & Bl, 868; Lewis v. Read, 13 M. & W., 834; Rogers v. Kneeland, 10 Wend., 218. But did he intend to? We think, that in view of all the circumstances, that the meaning to be given to the language used in those telegrams, and the inferences to be drawn from them, were matters to be submitted to the jury. White v. Hoyt, 73 N. Y., 505 ; First Nat. Bank v. Dana, 79 id., 108; Kenyon v. K. J. & M. M. A. Ass’n, 122 id., 247; 33 St. Rep., 467. It certainly cannot be inferred as matter of law that, without knowing anything about the provisions of the contract, Mackay intended to purchase telegraph properties which he had always claimed as his own, and not only pay $100,000 therefor in cash, but surrender to Stokes a note for upwards of $370,000 against his firm, and in addition thereto re *823 lease him from any accounting for over $1,000,000, which had from time to time been advanced to him. Mackay had, through, his agents, been claiming these properties and demanding that they should be turned over, and no one in the city of Hew York was authorized to purchase them upon any terms for him. He had no reason to suppose that an agreement had been signed by him, or in his behalf, releasing Stokes from the note which had no connection whatever with the telegraph properties, and when he telegraphed back “ all right and satisfactory,” what did he mean? We think it was for the jury, under all the circumstances, to infer what he meant and how he was understood. It is certainly not an unreasonable inference to suppose, in view of all the facts surrounding the transactions, that he meant it was all right and satisfactory that the bonds had been turned over to Ingersoll, and that the stocks and judgments, the fruits of the money he had advanced to Stokes, would also be turned over. Without giving our views at greater length, and without calling minute attention to all the evidence, we are very clear that there was nothing in the ,twro telegrams sent by Mackay on the 24th of December from which it could be said as matter of law that he became a party to the contract which had previously been signed by Stokes and De Castro. Mackay was not bound to direct Ingersoll to return the securities placed in his hands by Stokes. Ingersoll did not hold them as Mackay’s agent, but as custodian for Stokes. When Mackay refused to approve or sign the contract, Stokes, as between him and Ingersoll, was entitled to receive the securities again. Mackay could continue to demand the telegraph properties from Stokes as he had done before December 24th and even from Ingersoll, without making himself a party to the agreement He claimed the properties as matter of right before December 24th, and he could continue to claim them in the same way without adopting the agreement. Hone of the properties passed from Ingersoll into the hands of Mackay and thus out of the reach of Stokes until they were turned over in March, 1889, under an alleged agreement then made. There certainly was no conclusive evidence that Mackay so dealt with the telegraph or that he so acted or omitted to act in reference to them as to make the ■contract of December 24th binding upon him.
But when we proceed further it is made much plainer that there were questions of fact to be submitted to the jury. There was evidence of subsequent events which illuminate what went before.
There was evidence tending to show that the contents of the letter of Mackay to Ingersoll dated January 3d, and his telegram to De Castro of January 4th were communicated to Stokes; that Stokes knew then that Mackay declined to approve or sign the ■contract; that Mackay never at any time claimed any rights under this contract; that thereafter, down to the 20th of March, 1889, through his agents and in person, he claimed these telegraph properties as matter of right and not under the contract; that ■Stokes at no time in his interviews with Mackay and his agents *824 claimed that Mackay was bound by the contract; that all the-negotiations between Mackay and his agents on one side and Stokes on the other proceeded on the theory that the contract had not been signed or become binding; that nothing was done by Stokes in pursuance of or in reliance upon the contract, or in-performance thereof; that finally, on the 20th day of March, 1889, after some negotiations between Stokes and Mackay and his agents, an arrangement was made by which Stokes agreed to turn over to Mackay all the telegraph properties without any agreement as to compensation, relying entirely upon Mackay’s generosity for his compensation for his supposed interest in the properties, and that in pursuance of that arrangement he did turn over from time to time upon the demand of Mackay’s agents these-properties, never in any of the interviews with them claiming that he was doing it under the contract or that Mackay was in any way bound by the contract until shortly before the commencement of this action in June, 1890. There is also evidence by several witnesses of the defendants plainly contradicting nearly all the material evidence given by Stokes as a witness in his own-behalf,
Under such circumstances it is impossible for us to perceive how it can properly be held that there was no questions of fact for the determination of the jury, and that Mackay, as matter of law, was bound by the contract of December 24th, by the ratification and adoption thereof. We do not mean to intimate any opinion as to the weight of evidence on either side, or as to the merits of the controversy between these parties. The credibility-of both Stokes and Mackay, as witnesses, was matter for the consideration of the jury as well as the force and effect of all the evidence. The ultimate issue to be determined is whether Mackay became bound as a party to the agreement signed by Stokes and De Castro by ratification, adoption or estoppel, and all the evidence bearing upon that issue should be fairly submitted to the jury for their determination.
We have intended only to call attention to some of the main features of the case. Time and space forbid that we should qualify and limit some of -our statements as the evidence may possibly render proper. For the present purposes that is not needed. Stokes seeking to bind Mackay by a contract involving-enormous amounts, and to bind De Castro by a contract in which he has no interest whatever, should make a case by a preponderance of evidence clear and satisfactory.
We have not overlooked the fact that during several years-Stokes rendered valuable and efficient services in purchasing, defending and managing the telegraph properties, and while his compensation for such services is not directly involved in this action, it is an incidental feature of the case not lightly to be ignored.
Our conclusion is, that the judgment should be reversed and-a new trial granted, costs to abide event.